UNITED STATES v. NORTHERN PAC. TERMINAL CO.

(Circuit Court, D. Oregon. December 21, 1909.)

No. 3,544.

1. CARRIERS (§ 219*)—CARRIAGE OF LIVE STOCK—TWENTY-EIGHT HOUR LAW—"CONNECTING CARRIER"—TERMINAL COMPANY.

A terminal railroad company, which receives cars of live stock from other railroad companies for transportation and delivery to another company or to stockyards, is a "connecting carrier" whose road forms a part of the line of road over which the shipment is made, within the meaning of the 28-hour law (Act June 29, 1906, c. 3594, 34 Stat. 607 [U. S. Comp. St. Supp. 1909, p. 1178]), and is subject to its provisions as to interstate shipments.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 219.*]

2. CARRIERS (§ 37*)—CARRIAGE OF LIVE STOCK—TWENTY-EIGHT HOUR LAW.

A carrier, which receives and transports stock which has been kept in confinement for more than 28 consecutive hours by the connecting carrier from which it was received, violates the 28-hour law (Act June 29, 1906, c. 3594, 34 Stat. 607 [U. S. Comp. St. Supp. 1909, p. 1178]), and is liable to the penalty therefor, notwithstanding the first carrier has been prosecuted and has paid the fine for its own violation.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 37.*]

3. CARRIERS (§ 211*)—CARRIAGE OF LIVE STOCK—TWENTY-EIGHT HOUR LAW—CONSTRUCTION.

The provision of section 2 of the 28-hour law (Act June 29, 1906, c. 3594, 34 Stat. 608 [U. S. Comp. St. Supp. 1909, p. 1179]) that carriers of live stock in interstate commerce "shall not be liable for any detention of such animals, when such detention is of reasonable duration, to enable compliance with section 1 of this act," does not enlarge the time for loading or unloading, which by section 1 is not to be included in computing the time of confinement, and time spent in switching at terminal yards cannot be considered as a part of the loading or unloading.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 211.*]

Proceeding by the United States against the Northern Pacific Terminal Company. On motion by defendant for directed verdict. Motion denied.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

John McCourt, U. S. Atty.
Dolph, Mallory, Simon & Gearin, for defendant.

WOLVERTON, District Judge. There are three questions raised
upon the part of the defendant: (1) It is contended that the Terminal
Company is not a connecting carrier; (2) that the Terminal Company
should not be held liable to pay the penalty, because the Spokane, Port-
land & Seattle Railway Company has heretofore been prosecuted, and
paid the penalty; and (3) the question is presented whether or not the
switching at the terminal yards should be considered a part of the load-
ing and unloading of this stock.

It has been held by this court with reference to the safety appliance
act that the Terminal Company is a connecting carrier, and that it
should be held liable where it has violated the terms of that act.
United States v. Northern Pacific Terminal Company (D. C.) 144 Fed.
861. The Attorney General has passed upon the question in an opin-
ion delivered at the solicitation of the Department of Agriculture, in
which he says:

"I concur in this interpretation of the law, and upon the facts stated it is
my opinion that the law applies to these terminal railroad companies. The
statute is unambiguous, and is clearly designed to prevent any 'railroad com-
pany within the United States whose railroad forms any part of a line of
road over which cattle, sheep, swine, or other animals are conveyed from one
state to another,' from transporting such animals under conditions other than
those set forth in the statute. It seems to be clear from your statement of the
facts that these terminal companies accept stock for transportation to the
National Stockyards that has already been confined for more than 28 con-
secutive hours without unloading for feed, rest, and water. That being so,
the companies are undoubtedly liable for the penalty which the statute pro-
vides."

So I think that in this case, although the Terminal Company did
carry this stock but a short distance, it ought to be considered, and will
be considered, as a connecting carrier with any other railroad company
coming into Portland, through and by reason of its aid in taking stock
up delivered to it by other companies centering here, to be carried for
delivery to another company, or to be delivered to the Union Stock-
yards. And thus I hold that, as to the first point, this is a connecting
carrier. The same thing is held by Judge McPherson in the case of
United States v. St. J., etc., Co., 181 Fed. 625.

The next question: Can the Terminal Company be held liable when
it appears that the Spokane, Portland & Seattle Railway Company has
been prosecuted, and has paid the penalty, for carrying this stock?
One case has been presented here (United States v. Stockyard Ter-
minal Company [C. C.] 172 Fed. 452) which holds in effect that, when
one company has violated the law by carrying the stock for 28 hours,
or with consent 36 hours or more, and then has been prosecuted and
paid the fine, no other prosecution can be had, unless some other com-
pany has taken up the stock and carried it for 28 or 36 hours, as the
case may be, subsequent to that time. I am not in accord with that
view of the law. It seems to me that this statute is remedial in its
intendment. It was adopted for humane purposes, and was designed
to prevent the wrongful or cruel treatment of stock. Furthermore, it

was adopted for the purpose of preserving cattle in good order for future uses; and the purpose is to prevent the carrying of stock or the abuse of it in that way. It is criminal in its nature. Yet, in order to enforce the law, the act has given a right of civil action, and whoever violates the law, whether one or more, each individual carrier is liable for the penalty prescribed. Suppose, for instance, the Oregon Short Line, in carrying stock from the East to Huntington, had been carrying a car load of stock more than 28 hours before it reached Huntington, that company would then be liable. Next, suppose the Oregon Railway & Navigation Company takes the stock up at Huntington, and carries it on to Pendleton, less than 28 hours, but knowing that the stock has been in continuous travel more than 28 hours before, then the question comes up, would both railroad companies be liable? I think they would, unmistakably; because the latter company takes the stock and carries it on while it has been in confinement more than 28 hours, or 36 hours, as the case may be. That would make it liable along with the Oregon Short Line Company. I think that both in that instance would be subject to fine and penalty, and the action would lie against either one or both. And so in this case it is true that, if the defendant company, being a connecting carrier, as I conclude, knowingly took up the stock and carried it on to its destination, having knowledge that it had already been carried more than 36 hours, it would be liable, notwithstanding the Spokane, Portland & Seattle Railway Company had already been prosecuted for the same cause. Each individual carrier that violates the law is liable to the penalty. That is my construction of the law.

The other point depends upon the construction of the statute. The first section of the statute (Act June 29, 1906, c. 3594, 34 Stat. 607 [U. S. Comp. St. Supp. 1909, p. 1178]) provides that no railroad company—

"whose road forms any part of a line of road over which cattle, sheep, swine, or other animals shall be conveyed from one state or territory * * * into or through another state or territory * * * shall confine the same in cars * * * for a longer period than twenty-eight consecutive hours without unloading the same in a humane manner, into properly equipped pens for rest, water, and feeding," etc.: "Provided, that upon the written request of the owner or person in custody of that particular shipment, which written request shall be separate and apart from any printed bill of lading, or other railroad form, the time of confinement may be extended to thirty-six hours. In estimating such confinement, the time consumed in loading and unloading shall not be considered, but the time during which the animals have been confined without such rest or food or water on connecting roads shall be included, it being the intent of this act to prohibit their continuous confinement beyond the period of twenty-eight hours, except upon the contingencies hereinbefore stated."

Section 2 provides:

"That animals so unloaded shall be properly fed and watered during such rest either by the owner or person having the custody thereof, or in case of his default in so doing, then by the railroad, express company, car company," etc., "at the reasonable expense of the owner or person in custody thereof, and such railroad, express company, car company * * * shall in such case have a lien upon such animals for food, care, and custody furnished, collectible at their destination in the same manner as the transportation charges are

collected, and shall not be liable for any detention of such animals, when such detention is of reasonable duration, to enable compliance with section 1 of this act.",

Now, I think that section 2 was enacted for the purpose of the protection of the railroad company. That is, in default of the owner of the animals appearing to feed them or take care of them while at rest, the railroad company might take care of them itself; or it should take care of them, and in that case it should have a lien upon the animals for the expense incurred. Then it is provided that, in so taking care of them, so unloading them, and so complying with this law, the railroad company shall not be liable for any detention of such animals, when such detention is of reasonable duration to enable compliance with section 1 of the act. So that when the railroad company has unloaded the stock in order to comply with the provisions of the act, and kept them at rest for the time fixed by the act, it shall not be liable for that detention to the shipper. And I think that is what this section means. I do not think it has relation to the time consumed in loading and unloading the stock as being time not to be included in the time of carriage. I construe section 2, therefore, as not enlarging the time which is given under the first section for loading and unloading. And it does not seem to me that the time spent in switching from one track to the other about the switching yards should be deducted from the time of carriage, but simply that space of time that would be required in putting the animals aboard the car, and in unloading them when necessary.

I will therefore overrule the motion for a directed verdict.